DANIEL G. BOGDEN
United States Attorney

HOLLY A . VANCE
Assistant United States Attorney
100 West Liberty Street, Suite 600
Reno, Nevada  89501
Telephone:  (775) 784-5438
Facsimile:  (775) 784-5181

JOHN WARSHAWSKY
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
Civil Division, Fraud Section
601 D Street, N.W., Room 9132
Washington, D.C.  20004
Telephone:  (202) 305-3829
Facsimile:  (202) 305-7797

Attorneys for United States

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JAMES R. ADAMS, et al., <br><br> Plaintiff, <br><br> vs. <br><br> AURORA LOAN SERVICES LLC., et al., <br><br> Defendants. | Case No. 2:11-cv-00535-RCJ-PAL <br><br> **UNITED STATES' STATEMENT OF INTEREST WITH REGARD TO DEFENDANTS' JOINT MOTION TO DISMISS** |

Pursuant to 28 U.S.C. § 517,[1] the United States of America respectfully submits this Statement of Interest concerning certain arguments made by defendants to support their joint motion to dismiss the relators' third amended *qui tam* complaint.  *See* Memorandum in Support

---

[1] While 28 U.S.C. § 517 authorizes the United States to file this Statement of Interest because this matter affects "the interests of the United States," *id*., the United States has also filed an unopposed motion for leave to file this statement, as well.  United States' Unopposed Motion for Order Allowing the United States to File Statement of Interest No Later Than September 9, 2013, With Regard to Defendants' Reply in Further Support of Their Joint Motion to Dismiss (Aug. 15, 2013) (Dkt. No. 158).

1

of Defendants' Joint Motion to Dismiss, at 27-29 (Apr. 15, 2013) (Dkt. No. 100-1) (Def. Mem.); Defendants' Reply in Further Support of Their Joint Motion to Dismiss, at 17-18 (Aug. 12, 2013) (Dkt. No. 149) (Def. Reply Br.).  While the United States has not intervened in this case brought pursuant to the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, the United States remains the real party in interest in this matter.  *See, e.g., United States ex rel. Killingsworth v. Northrop Grumman Corp.*, 25 F.3d 715, 720 (9th Cir. 1994) ("It is clear, however, that in a *qui tam* action, the government is the real party in interest.") (citing and quoting *United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Center,* 961 F.2d 46, 50 (4th Cir.1992) ("[The] United States is the real party in interest in any False Claims Act suit, even where it permits a *qui tam* relator to pursue the action on its behalf.")); *see also* 31 U.S.C. § 3730(c)(3) (authorizing United States "to intervene at a later date upon a showing of good cause.").

      This Statement of Interest takes no position as to the overall merits of the defendants' joint motion or the merits of the relators' allegations in this *qui tam* action.  Because the FCA is a critical tool relied upon by the United States to obtain redress for fraud and false claims affecting the government, however, the United States submits this Statement of Interest to provide assistance to the Court and to be heard regarding the narrow issue, alluded to in defendants' initial brief and made clearer in their reply brief, whether the FCA, as amended in 2009, applies to the defendants' requests or demands for money made to Fannie Mae and Freddie Mac in the period after they were placed into federal conservatorship.[2]

---

[2]     In filing this Statement of Interest, the Government does not challenge the defendants' contention that the FCA, prior to the 2009 amendments, has no application to Fannie Mae or Freddie Mac.

I.  CONGRESS AMENDED THE FCA IN 2009 TO PROTECT AGAINST FRAUD AND FALSE CLAIMS MADE WITH RESPECT TO FUNDS EXPENDED IN THE WAKE OF THE FINANCIAL CRISIS

As the defendants recognize in their briefs, the FCA was amended substantially in 2009. *See* Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21, 123 Stat. 1621 (May 20, 2009).  The legislative history for FERA confirms that Congress was acting to respond to judicial decisions which, in Congress's view, would put at risk public funds expended in response to the financial crisis:

> The effectiveness of the False Claims Act has recently been undermined by court decisions which limit the scope of the law and, in some cases, allow subcontractors paid with Government money to escape responsibility for proven frauds. *The False Claims Act must be corrected and clarified in order to protect from fraud the Federal assistance and relief funds expended in response to our current economic crisis*.

S. Rep. No. 111-10, at 4 (emphasis added), *reprinted in* 2009 U.S.C.C.A.N. 430, 433.  *See also* S. Rep. No. 111-10, at 10, *reprinted in* 2009 U.S.C.C.A.N. at 438 (expressly rejecting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008), and *United States ex. rel. Totten v. Bombardier Corp.*, 380 F.3d 488 (D.C. Cir. 2004)).

A comparison of the pre-FERA and post-FERA definitions of what constitutes a "claim" under the FCA reveals, first, that the amended definition clarifies that the United States need not have had title to the money or property claimed.  *See* 31 U.S.C. § 3729(b)(2)(A) (2009) (the term claim "means any request or demand, whether under a contract or otherwise, for money or property *and whether or not the United States has title to the money or property*, . . . .") (italicized language added by FERA).  Moreover, the definition of claim was expanded to include requests or demands made to contractors, grantees, or other recipients "if the money or property is to be spent or used on the Government's behalf *or to advance a Government program or interest . . . .*" *Id.* (emphasis added).  Thus, FERA makes clear that the FCA now extends to

3

fraud on a third party that receives federal funds, if that fraud undermines the Government's purpose in providing those funds. As a result, the relators' allegations with regard to Fannie Mae and Freddie Mac are sufficient to state actionable false claims under the current version of the FCA.

II. THE THIRD AMENDED COMPLAINT'S ALLEGATIONS BASED ON REQUESTS OR DEMANDS MADE TO FANNIE MAE AND FREDDIE MAC ALLEGE CLAIMS THAT ARE COGNIZABLE UNDER THE FCA, AS AMENDED BY FERA

There can be no serious doubt that Fannie Mae and Freddie Mac, which are often referred to as "Government Sponsored Enterprises" or "GSEs," were established by Congress "to advance government programs and interests." 31 U.S.C. § 3729(b)(2)(A)(ii). The GSEs were established by Congress to facilitate home ownership through the provision and development of secondary markets for conventional mortgages. *See* Housing and Urban Development Act of 1968, Pub. L. No. 90-448, Title VIII (Aug. 1, 1968) (establishing Fannie Mae as a "Government-sponsored private corporation"), *codified at* 12 U.S.C. § 1716b; Emergency Home Finance Act of 1970, Pub. L. No. 91-351, Titles II and III (July 24, 1970) (authorizing Fannie Mae to provide a secondary market for conventional mortgages and establishing Freddie Mac for similar purposes), *Freddie Mac provisions codified at* 12 U.S.C. § 1451 *et seq*.

Further, Congress confirmed that maintaining the operations of the GSEs was deemed necessary to advance government programs and interests in 2008, when it enacted the Housing and Economic Recovery Act of 2008 (HERA), Pub. L. No. 110-289 (July 30, 2008), which, among other things, established the Federal Housing Finance Agency (FHFA) to provide oversight of the GSEs. HERA, § 1311(b)(2), *codified at* 12 U.S.C. § 4511(b)(2). Less than six weeks later, on September 7, 2008, the GSEs were placed into conservatorships administered by FHFA, and the Treasury Department entered into preferred stock option agreements and

undertook other measures to maintain and fund the continuing operations of the GSEs. *See* Exhibit 1 (Statement of FHFA Director James B. Lockhart (Sept. 7, 2008) (statement available at www.treasury.gov/press-center/press-releases/Documents/fhfa_statement_090708hp1128.pdf)); Exhibit 2 (Treasury Department Press Release (Sept. 7, 2008) ("Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers") (press release and related documents available at www.treasury.gov/ press-center/press-releases/Pages/hp1129.aspx)).[3]

Given the breadth of the amended definition of claim in the FCA and the undeniable facts that (a) defendants made requests or demands for monies from the GSEs and (b) the monies were spent by the GSEs to advance government interests, it appears that defendants' only real challenge to the applicability of the FCA to such claims is whether there was "a specific connection between the defendants' requests and the Government's funding." Def. Reply Br. at 17.[4] Defendants support this argument by relying upon a single, distinguishable, *and*

---

[3] Defendants' reply brief suggests that this Court cannot consider that the GSEs were placed into FHFA-administered conservatorships or that substantial federal resources have been expended to maintain the operations of the GSEs. *See* Def. Reply Br. at 15 (noting that such facts were not pled in third amended complaint and not "supported by any citation of any kind."). The Government takes no position whether the relators have properly alleged facts sufficient to state a claim. This Statement of Interest only responds to defendants' argument that, as a matter of law, the amended FCA does not extend to fraud on Fannie Mae and Freddie Mac. Through this Statement of Interest, the Government respectfully advises the Court that the defendants' legal argument on this point is erroneous and should be rejected.

[4] In making this assertion, defendants implicitly concede that they made requests and that there was government funding that satisfied the requests. Instead, their challenge asserts that there must be some form of "specific connection" between their requests and the government's funding. Such a challenge flies in the face of Congress' plain intent to "correct[] and clarif[y the FCA] in order to protect from fraud the Federal assistance and relief funds expended in response to our current economic crisis." S. Rep. No. 111-10, at 4, *reprinted in* 2009 U.S.C.C.A.N. 430, 433.

5

*nonprecedential*[5] case. Def. Reply Br. at 17-18 (discussing *Garg v. Covanta Holding Corp.*, 478 F. Appx. 736, 741 (3d Cir. 2012)).

In the *Garg* case, the relator brought suit on behalf of a state utilities authority and alleged that the utilities authority was a federal grantee because it was authorized to issue tax-exempt bonds, i.e., that purchasers of bonds issued by the utilities authority would not be subject to income taxation for interest paid by the bonds. 478 F. Appx. at 739, 740. Because purchasers of such bonds were not subject to income taxes on interest, the utilities authority was able to issue bonds with a lower interest rate, and the relator asserted the utilities authority was a grantee because "the entity has more money in its proverbial pocket (thanks to the federal government) than it would if it had to issue nontax-exempt bonds at a regular interest rate." *Id.* at 740.

The Third Circuit rejected the relator's assertion because the relator could not point to any payments made by the United States. In language that plainly distinguishes *Garg* from the case before this Court, the Third Circuit explained, "With or without [the defendant's] alleged fraud, the treasury of the United States would be in the same position." *Id.* at 742. By comparison, the fact that the United States and the Treasury Department have expended extraordinary sums of money to maintain the operations of the GSEs – and that those costs included amounts paid to the defendants in this case for their claims, to the extent the relators have pled that defendants increased the operating losses of the GSEs and caused the GSEs to require additional funding from Treasury to cover those losses – renders *Garg* wholly inapposite. Indeed, the very reasons cited by the Third Circuit for rejecting the relator's complaint in that

---

[5] The *Garg* opinion expressly states that it was not selected for publication and references Third Circuit Local Appellate Rule, App. I, IOP 5.7, which provides, "The court by tradition does not cite to its not precedential opinions as authority. Such opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing."

case stand as support for the conclusion that the relators could state a claim under the FCA. Again, the Government takes no position whether they properly did so.

CONCLUSION

For the reasons set forth herein, the United States respectfully urges this Court to reject the defendants' arguments that the FCA has no application to amounts paid in the course of the Government's conservatorships of Fannie Mae and Freddie Mac, as a matter of law.

DATED this 9th day of September, 2013.

Respectfully submitted,

/s/  John Warshawsky

John Warshawsky (D.C. Bar No. 417170)[6]
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
601 D Street, N.W., Room 9132
Washington, D.C. 20004
Telephone: (202) 305-3829
Facsimile:  (202) 514-0093
E-mail: john.warshawsky@usdoj.gov

---

[6]   John Warshawsky is a Trial Attorney with the U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Fraud Section, which is primarily responsible for handling this matter.  On June 3, 2011, this Court granted a motion to admit Mr. Warshawsky to practice before this Court for this matter.

7

Certificate of Service

I hereby certify that on September 9, 2013, a copy of the foregoing "UNITED STATES' STATEMENT OF INTEREST WITH REGARD TO DEFENDANTS' JOINT MOTION TO DISMISS" was filed electronically through the Court's Electronic Case Filing (ECF) system. I understand that notice of this filing will be transmitted to all parties by operation of the ECF system and that parties may access this filing through the ECF system and the Public Access to Court Electronic Records (PACER) system.

/s/  John Warshawsky
_____